All right, next case up is Burns v. Town of Palm Beach. We'll hear from Mrs. Daniel or the appellant when she is ready. May it please the court, this is Lori Webb Daniel representing appellant Donald Burns. Now this week I've been telling people that my argument today would be about architecture as free speech, but now that I'm in court I'd like to be more using the wrong test, an unprecedented test to hold that the Town of Palm Beach did not infringe on Burns' First Amendment rights when it rejected his custom-designed architectural plans for a new home in a modern style to replace his existing traditional home as an expression of his persona, his philosophy, to show he was not tied to the past when the town did so only based on subjective determination that the design was too dissimilar to neighboring properties, quote, not in harmony, end of quote. The district court erred by engrafting a predominantly purpose, a predominant purpose test from a second circuit commercial merchandise case onto the expressive conduct test adopted by the United States Supreme Court in Texas v. Johnson and which has further been explained by this court in the Holloman decision. Now this was error for two reasons, at least two reasons. First off, the Johnson test already addresses the situation where there is both expressive and non-expressive elements when those are combined. And also this case does not involve commercial merchandise. It involves only a personal non-commercial expression. Now turning to the question of what do you do when you have both speech and non-speech elements combined in the same situation. Now in Johnson, the court, it was speaking of the lesser standard that applies when a government has an interest in regulating a non-speech element. And the court said that although we've recognized that where, quote, speech and, quote, non-speech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms. But it goes on to say we have limited the applicability of that more lenient standard, that O'Brien standard, to those cases in which the governmental interest is unrelated to the suppression of free expression. In stating, moreover, that O'Brien's test in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions. In other words, a neutral restriction. Quote, we have highlighted the requirement that the governmental interest in question be unconnected to expression in order to come under the O'Brien's less demanding rule. So in other words, it's okay to regulate non-expressive conduct even though it may have incidental impact on speech. But the regulation has to be unconnected to the expression. Now, the preliminary question, of course, is whether there is expressive conduct. And this is where the district court went wrong. Now, Johnson set out the test, and it said that in deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we've asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it. And in the Holloman case, this court further explains, because it explains that it's not necessary that an observer understand the particular message that was meant to be conveyed. Because, for example, if you look at a painting of Jackson Pollock or a Jabberwocky of Lewis Carroll, people are going to have different understandings of the message. And that's common with art and artistic expression. Counsel, this is Robert Luck. I want to fast forward you a little bit. So let's assume that I agree with you that the Holloman test, the one articulated by Johnson, should apply, and that your client meets the first factor of whether this is expressive conduct, that he had the intent to convey a particularized message. And we then look at the second factor of whether the surrounding circumstances are such that the likelihood was great that the message would be understood by those who viewed it. In the Fort Lauderdale case, which is the most recent one that I can tell where we discussed this, we looked at a bunch of different factors to see whether it meant that it would be understood by others' context. And let me just go over a few of those factors and then ask you about how those apply here. The court looked at the fact that there were tables and literature set up at the event such that they were giving it to other people at this meal that they were serving to point out the homeless problem, that the group invited all other people in the neighborhood to come. Everyone was invited to come and share a meal, that it would happen at a city park, and that it was an issue of concern to the community, and that there had been a long history of the group doing this activity. All of those things went to the court in ultimately deciding that second factor of whether the surrounding circumstances are such that there was a likelihood likely it was great that the message would be understood by others. How do those factors apply when we're looking at your client's house on the ocean in Palm Beach? Well, actually, because we're talking about architecture, I believe that the subject matter here is even more close to pure speech than you would have where you've got a statement being made through the conduct of serving a meal to make a statement about the homeless. But let me point out that the district court, the magistrate judge initially recognized and district court adopted the view that the custom design, the custom design militates in favor of an observer discerning some expressive message, and that architecture in general is perceived as artistic. Let me just interrupt you for one moment. I think the thrust of the question that Judge Luck is asking on the second prong is whether anybody, whether this proposed house would in fact be road, it was pretty much hard to see because the last plan had it pretty heavily wooded with trees and shrubs and the like. Was it visible from the beach? Yes, absolutely, Your Honor. And if you look at the modeling that was submitted through document 42, which was the lawyer that represented Mr. Burns at the ARCOM hearings, that has a picture and shows it's quite visible from the beach. So yes, it was visible. Counsel, the front of that model facing us or facing the camera is what faces the beach? Yes, I believe that's right. I should have that right in front of me right now. But yes, it shows the beach and yes, that would be correct. I don't see it shows the beach unless they're green beaches in Florida. My problem, and I guess this is common, Terry, on the content of the speech is with modern houses, it's sometimes difficult to tell what's the front and what's the back. But I will take it unless you correct it on your reply argument that what is facing the camera is what is facing the beach. Yes, Your Honor. The house is quite visible from the beach. It's also visible through the gates to the entrance of the house from the street. So it is visible. So it's not just entirely... Let me stop you at that point, Counsel. The beach, is it a public beach or a private beach? It's a public beach. Well, it's a beach. Yeah, beaches are public. The beach is one that people can walk along and look at the houses and see the difference. And the point here is this house is, the whole reason why the design was rejected is because it's dissimilar. And so there is the ability to see some message. And the district courts, the test that applied, it focused on this predominant purpose test. It didn't say that there was no message. So what it did was it looked and said, okay, so there may be a message here. It said the message might be ambiguous. Counsel, can I go back to the Fort Lauderdale factors, please? Is your client setting up tables or distributing literature to come look at his house so that others can see the message? He's not setting up tables. No, he's building a design. Did he invite groups to come share and to come, like bus tours to come, please see my house and the message that I want to convey? No, Your Honor. And I would... Is this in a city park? Is this in the middle of... I know there's some places in Palm Beach that are very sort of visible and public. And then there's streets that are sort of three back from the main road. Is this the equivalent of a city park or is this sort of set off a little bit from the main drag of Palm Beach? Oh, it's right in with a row of other houses. And again, it's an artistic statement. It is a congressional... I'm sorry. I couldn't hear what was said. I don't think anything was said other than hearing from you. I'm sorry. I thought I heard. Just a second. Let me check on the time. All right. Let me just continue. Sorry for that interruption. I thought I heard something through in the background. Okay. So expression. All right. So the court found expression, but it went wrong because it was focusing in on a predominant purpose. That was, I believe, our courtroom deputy. Ms. Teeza, were you announcing that her time was up? That's correct. I was. Can I ask just one quick question, Chief, before we run? Certainly. Ms. Daniel, is it your view that what we ought to do in this case is rule that the judge applied the wrong test and that he ought to have applied Johnson and Halliman rather than essentially the Second Circuit test and remand for him to apply the test? Or is it your view that we actually ought to be doing the application in the first instance of Johnson and Halliman to the two-factor test? At a minimum, Your Honor, you should reverse because the test is the incorrect test. The Halliman test, which is whether a reasonable person would interpret it as some sort of message, is what controls. However, because we're dealing with the NOVA review and a record here, the court can look and see that this was a content-based restriction, and thus it's subjected to strict scrutiny. And the government would have to show compelling governmental interest, which it can't do here because aesthetics under our law is not a compelling interest. The short answer to my question is you would have us make the application of Johnson and Halliman test here rather than remanding it to the trial court. That's correct, Your Honor, because I believe the record supports that, and so that we would ask for a reversal and a ruling consistent with the case law applying a strict scrutiny standard. Well, let's do it while we're talking. I'm sorry, go ahead, Stan. Yeah, I just, the only final thing I wanted to ask you to do when you sit down and you can look at your notes when you come back up on rebuttal, Judge Carnes asked you a question that I think is really important as a matter of fact. He was asking whether, if you look at the rendering that you submitted most recently as Exhibit A, the demonstrative exhibit, whether that is facing the beach, and there was a second item that you had submitted with the material so that we could find in the record that was called the East Oceanside Perspective. Is that the same view just from a wider angle? I just want to make sure that this faces the beach, what you're referring to. Oh, yes. I think possibly there may have been some confusion. When I first submitted the picture to Ms. Pisa, it was not rotated correctly, and so I had it rotated because it was sideways before. So I'm looking at it now. Why don't you get that? It sounds to me like there's some confusion there. Why don't you get that straight during the rest of your argument and bring it up in your reply? I can do that, although I'm looking at it right now. So I can say that, whether there's, it's the front of the house or the back of the house. I mean, obviously there's not a driveway, but the house is, what I showed at the front of the picture is the beach side of the house that's visible from the beach. I have one argument before you sit down. You argued for the strict scrutiny test to be applied to zoning decisions having to do with aesthetics. Do you have any decision by any court anywhere which has applied in a holding the strict scrutiny test to zoning decisions related to aesthetics? Your Honor, there's no opinion on point. Let me point out one other thing, though, to make contact. Wait, wait, wait. I'm not asking you to point out other things. I'm asking you if you have any decision of any court anywhere holding this First Amendment strict scrutiny applies to zoning decisions, any zoning decision of any kind, other than churches. There is the Metro Media decision from the United States Supreme Court. That was the San Diego decision involving billboards where there was a distinction. I'm sorry, counsel. I was asking about house zoning, residential zoning. Oh, residential zoning. I know of no case upholding such a restriction or... Are applying strict scrutiny at all, whether it upheld it or struck it down, do you? Not in the context where there was a restriction that's based on content-based, speech-based restriction as we have in this case. Thank you, counsel. We will give you a full five minutes on your clock. Thank you. Ms. O'Connor from the City of Palm Beach. Good morning, Chief Judge Karnes, and may it please the Court. My name is Joanne O'Connor on behalf of the FLE Town of Palm Beach. The District Court correctly granted summary judgment on all issues, and I'll focus here on the First Amendment claim. As to the First Amendment claim, no court has ever held that a home is pure speech or otherwise protected expression, and Mr. Burns offers no reason why this court should be the first to do so. The District Court properly considered the context surrounding Mr. Burns' proposed home, including its purpose, before concluding that it is not inherently expressive, and this court should reach the same conclusion as a matter of law. I just wanted to stop you on that. Ms. O'Connor, is it your view that there is no First Amendment expressive interest in a piece of architecture for a residential home that is a matter of law, there can be no First Amendment protection? As a matter of law, it would depend on the architecture, Your Honor. And so what the They begin with the written and spoken word, and they go on to things like visual art, like paintings, photographs, prints, and sculptures. Now, could we conceive of a circumstance where a Gothic cathedral that's existed for hundreds of years, Notre Dame, for example, or even something like the White House, which is... for a residential home designed by, built by Frank Lloyd Wright. Would that have any, as an abstract matter, could there be any First Amendment protection for that? Or is it your view in the residential area, if the zoning said no, that's the end of the story, there is no First Amendment expressive right, period, end of story, in the residential area? My view in the residential context is probably not, it would probably not be protected. And that's because, as Judge Luck pointed out, with this court considering in Fort Lauderdale, food not bombs, factors such as the historic symbolism of the object are critical. And there in the Fort Lauderdale case, this court observed that the sharing of food as a means of communicating dates back millennia. If courts had recognized and society had recognized that homes were mediums of expression, you know, this Republic, folks have lived in homes for 240 years, yet we find not a single case that has ever recognized a First Amendment right protected by strict scrutiny in a home. There are landmark ordinances, historic preservation ordinances throughout this country. And what the reasonable observer expects, when it comes in contact with the home, whether designed by Frank Lloyd Wright, or by the designer Mr. Burns chose, is that it's a house. A house is a house, it's something to provide shelter, and for a person to live in. And I think another issue... Counsel, you don't need to take that extreme of a position to say that residential architecture can never be expressive to win your case here, correct? Correct. Absolutely not. I mean, the issue here... Why don't you argue your case on grounds where you don't have to take such a strong imperative? Yeah. And thank you, Judge. And I'd like to address the photograph of Mr. Burns' proposed home that Ms. Daniel asked this court to consider, because I think three points are raised. Number one, as Chief Judge Kearns observed, this house would not be visible from the public. You have to ask yourself, what, if anything, does a reasonable observer see when viewing this home? The photo that you're provided, it's a bird's eye view, showing that the only unobstructed view of this home is from somewhere out over the water. The home is set back from the water, and it's covered on the north, south, and we can even see the trees poking up above the structure on the west property line, such that if this house is designed to send a message, it's clearly pointing the wrong way. Any message is being sent out into a void, because the house is... Let me follow up on that, Ms. O'Connor, if I can, so I understand it. We have two pictures of the glass and concrete facing the beach and the water. Was not the beach a public beach, and if so, would it not be visible to anybody walking along the beach, on the beach side of the house? Sure. I mean, beaches in Florida are public, and so if someone should happen to walk along this portion of the beach, it's certainly not. There's no evidence to the record this is not a traditional public forum. This is not a public park. It's not dedicated... No, I'm not asking that. I'm not... I wasn't asking that question. I was simply asking, one, was this a public beach that the house fronted, backed onto, and would it not have... If that is the case, would it not be visible to anybody taking a stroll along the beach? Yes, I believe it is a public beach, and so there would be some folks who could view this house from the ocean or from the beach, but I think the second point that this photograph makes is that if we assume a reasonable observer could get onto the beach or get over the hedges that separate this house from its neighbors, there's still no great likelihood that any passerby would understand it to be communicating anything. This court has recognized, as has the Supreme Court, that context matters, and never has the exterior facade of a home been understood to be a medium by which its residents communicate with the outside world. There's just no historical or societal context to believe that any house that you might come across is designed to communicate or be inherently expressive. I thought the very reason that the neighbors objected and the architects voted no by five to two was precisely because it was visible and it was an eyesore to anybody in the area. Not that it was hidden, but that it was obvious, that it was massive, that it was excessively dissimilar, but that only could happen if it were visible and visible to from the street or from the beach or from the water. Have I misunderstood what's happening here? Well, I think, Your Honor, if you credit Mr. Burns, his intent, which he's saying, I'm intending by this home to be sending a message that I'm different, he claims that he intended to send a message that he's more simple and desires fewer possessions, despite the fact that this house is twice the size of the house that existed before and significantly larger than his neighbor's home, I'd respectfully submit that his architectural design preferences, individually or collectively, do not justify First Amendment protections. No, no, I'm asking a different, I'm sorry, I don't mean to interrupt you, but I was really asking a different question. I was asking the question about that would flow from if we were to apply the Johnson test, the second prong, and that is whether the house was otherwise visible to the public from the beach, from the water and beyond. And when I looked at the objections from the neighbors, which were part of the record, the first one was the obvious lack of harmony with its neighborhood visible to the public and adjoining property owners. The second one, with regard to the view from the beach and the water, it will mar the ambience and the view. The third one, this house will be directly reviewed, viewed from a popular public beach, accessed by the Eden Row access point, one home away from Mr. Burns. This excessively dissimilar house negatively affects the views of the public from the public beach. A fourth one says, one of the members of the Archon board said, if I were walking on the beach or sailing by here, you've got something that clearly doesn't match the others. Isn't it clear from this record that it was visible and that it was precisely because it was so excessively dissimilar that they wanted to prevent it? Not that it wasn't visible to the public? Well, I'd say there's certainly evidence in the record that it was visible. And second, yes, Archon turned this house down because it was excessively dissimilar from the houses within the 200 foot radius. But that doesn't satisfy, that doesn't get us to the second prong, even of the Johnson test, without adding the predominant purpose element. Because Johnson requires that there be a great likelihood that a reasonable person observing this house in its surrounding circumstances understand it to be sending them a message. And a message of Because the guiding principle on which all of our aesthetic regulations are based by their nature can tell some level of uniformity and curtail individual differences and beliefs as to what is beautiful. And they do that in the name of promoting notions of widespread beauty, harmony, and residential character. And courts for years have upheld such regulations as promoting the general welfare of the entire community. So to reverse the district court on the First Amendment claim would unsettle years of precedent in this area without any basis. There hasn't been any radical societal or jurisprudential change. A house is still just a house. And of course, they're still not expected to and do not communicate messages. It's not, it's the difference that the Hurley, the Supreme Court Hurley noted, marching to get from point A to B is not protected, but marching to make a point for a purpose. And there, I think you see why the district court correctly added this predominant purpose element to the test, which is nothing unprecedented. It's merely a subset of the context analysis that this court and the Supreme Court have applied in the expressive conduct cases. Well, but counsel, this is Robert Luck. There's other things about Hurley that are different than that. And that goes back to Fort Lauderdale, which is what kind of street is it on? Who was invited to come? What were the, what was the purpose of being there? What's the historical context of a parade? Do any of those factors come into play here? Was this the kind of place where people were set up to come in the public to go view? Is this the kind of place where they were asked to come? Is there a historical associated with the exercise of First Amendment rights in oceanfront property? Do any of these things exist with regard to residential architecture? No, your honor. I mean, this is a private residence on a private lot in a residential area. It's a zone RA, large estate section of the town of Palm Beach. It's purely residential. And as you point out, I mean, this isn't like, for example, if you had a garden that you claimed that you were, was different and you were trying to send a message by the roses that you grew, you grew. It's not as if you're surrounding a corner and coming into, you see a rose garden that looks like the American flag and that has signage that says American flag by Joanne O'Connor, December 4th, 1992. There's nothing that indicates that this house is trying to communicate a message and interact with it, with the public in any way. And again, I just come back to the nature in which this would upset and submit that it's highly improper for Mr. Burns to effectively argue that he can flout the town's properly formulated aesthetic regulations and then turn around and claim the protection of the first amendment merely because he seeks to be different. And I'd commend to this court, his declaration, which is that docket entry 38 dash one, because I think it highlights the difficulty in and why we don't ascribe any first amendment protection to permanent residences like homes, because as chief judge Kearns pointed out, sure, Frank Lloyd Wright might, might design a home, but that home's going to exist for tens, if not hundreds of years and different residents are going to live in it. So Mr. Burns in his declaration says that he purchased this traditional style home that's currently on the lot because it represented his internal philosophy of formalism and tradition. But since 2013, he's been living in that same house yet he can see that no longer reflects that personal philosophy. And so it no longer, if it ever could send a message, it certainly hasn't been sending the message he wants it to be sending since 2013. And so this house needs to stand without Burns. And I, I just suggest that the Supreme court's decision and fair is important here because we need some explanatory conduct or explanatory speech to understand if this house is sending us any kind of message and without Mr. Burns declaration, without him living in the house, without the neighbors and the general pastors by knowing that he's the speaker, he's the person who lives there and what he's trying to say. Certainly we don't need a particularized message, but we need something far more diffuse than this Let me ask you a slightly different question. If I, if I can, Miss O'Connor, when I looked at the rules of the, uh, of the game, the, the architectural rules here, um, a couple of things struck me first. I take it. It is accurate that the proposed building met all of the setback lot coverage, square footage, and height standards, correct? Yes, Your Honor. Well, the, the house, no, I take that back. The house wouldn't have to go back. The house is nonconforming and it's a lot, so it requires a special exception. And so to that extent, it would have to go back before the town council to obtain a special exception. It's on an exceptionally skinny lot, a hundred feet wide. I misunderstand that. I thought the plaintiff's statement of undisputed facts included, quote, this is a docket entry 24 dash 45. They proposed building that all the setback lot coverage and height standards. That is to say the final proposed roof height was 42.66 feet less than the 45 foot height of the existing residence Burns had the height of the immediately adjacent homes were 47.65 and 38.38 feet. The proposed home would cover 21.74% of the lot, which was within the 25% and the total square footage fell within what was permitted. At least did I have that right? Yes, I believe so, Your Honor. Okay. Let me ask you a final question. If I were building a home, whether I was the homeowner or the architect that I retained, could I fairly know what was permissible or not where the regulations speak of excessive dissimilarity is out and excessive similarity is out. So it can be, it can't be too similar, but it can't be too dissimilar. Is that clear enough to give me fair notice of what I can and can't do in your view? Absolutely, Your Honor. And with regard, I think the only section that was applied to Mr. Burns relates to excessively dissimilar, but this RCOM ordinance has a number of detailed and very specific criteria under 18-205A6, which is the excessive dissimilarity. Things that are specific height, the height of the roof, the mapping, the quality of the design, and the citizens and the experts clearly in the record understood what those meant. And here, you not only have that, but you have a specially qualified RCOM group of RCOM members that are specially qualified by training and experience that's legislatively mandated in the town code. These are expert members of RCOM applying it, and you also have the guidelines that RCOM enunciated, and I'd submit finally that Mr. Chase, Mr. Burns' expert architect, clearly understood and repeatedly says that none of these, none of these criteria relate to architectural style. Thank you very much. All right. Thank you, counsel. We'll hear now from I'm sorry, Ms. Daniel. You've got five minutes, Ms. Daniel. Thank you, Your Honor. Ms. Daniel, may I ask you a question just at the outset? Sure. That sort of is like a cloud upon this whole claim that you make. If we were to agree with you, one, that there is some First Amendment protected expressive right here in the homeowner and the architect in putting up a mid-century modern home in an area where it is plainly dissimilar and profoundly dissimilar from a lot of the other stuff there, and two, we would apply the Johnson and Alleman tests here, would we not be upsetting pretty much every zoning ordinance in residential areas around the country and opening up to attack on First Amendment grounds any time the local board of architects or whoever had the authority to design these zoning issues, the whole question of aesthetics? Would they have to face a First Amendment fight in every zoning case like this? No, Your Honor. There can be restrictions. They need to be content-neutral restrictions. No, no, counsel. According to you, they need to survive strict scrutiny, which very little does. Well, a content-neutral restriction would certainly not invoke the strict scrutiny test if it's content-neutral. Wait, wait, I'm sorry. What content-neutral? If the architectural board said, this is a big, to us, ugly, dissimilar house, it really doesn't fit anything. Now, that's subject, according to you, to First Amendment protection and has to pass strict scrutiny. What RCOM decision going to dissimilarity would not have to pass strict scrutiny test? Well, there could be, for example, specific objective criteria for the matching, the size, if you would give me an example of dissimilarity. If you're talking about, they have to say, everything is under 40 feet tall. Suppose along comes Mr. Burns's cousin and says, I love tall houses. I like tall everything. I like to look down on the earth. That's part of my internal philosophy, and I'm going to build a house that's 45 feet tall. That is his message, and that would, according to you, give him First Amendment expression protection to the extent of the strict scrutiny test, would it not? Well, again, it depends on whether there are across the board restrictions on height that would be proper ways of controlling such a thing. Let me mention one thing. Even if you go to a lesser... Well, I'm sorry. I'm sorry. You tell me the difference in the message strength between what Mr. Burns's hypothetical cousin said and what Mr. Burns says. Are you saying that the First Amendment expression protection doesn't apply if they're objective standards, but they apply if they're not objective standards? Is that the key to your test? The key is whether it's content-neutral restrictions. But the problem with that, I'm trying to ask you about, is everything about aesthetics is content. There's no non-content aesthetics. You look at what it looks like. You look at what is contained in the building, and if you hook it to a message, every house that doesn't conform to the other houses or that simply cookie-cutters them is obviously sending a message to the person who designed and built it, which is, this is the kind of house I like. The line drawing problem is, I think... Your Honor, let me suggest another line drawing issue here that I think weighs in our favor. Even if you apply a lower standard, substantial scrutiny standard, the government still has to narrowly draw. It has to have an interest that's more than just expressed in a general aesthetics term. It has to show that its governmental interest is narrowly tailored. And here we've got... The Supreme Court has never held that. The Supreme Court and our court have repeatedly held that its aesthetic interest is a strong governmental interest and may be regulated through zoning ordinances. I understand that, but it has to be a zoning order that is understandable and can be understood. You don't really pretend that Mr. Burns thought when he came up to that first house and then came up to this house that it met the ordinance. There are a couple of things here. It has to be narrowly drawn in order to, number one, make it clear to a person to understand what's meant. And number two, it also has to prevent arbitrary administration. And we have that as well in this board that kind of went on with a whim. I mean, if you look at the ordinance itself, it speaks in terms of not in harmony, of excessively dissimilar. Those terms are not defined. They're open-ended terms. Then you attack the standards on due process ground or on vagueness ground. But you've got a bolder attack as a primary one here, which is the first amendment. Let me ask you this. If somebody's walking on that beach, why would it be overwhelmingly apparent to that person? Let's say they're from New York. They're walking on the beach. Look up at that house. Why would it be overwhelmingly apparent to that person that the house was intended to and does send a message? Your Honor, going back to the Holloman case, this court held that at least some people would understand that there was being a message sent. And here, we're talking about artistic creation ideas expression. And at least some people walking down the beach... Any house that is artistically created, it's overwhelmingly apparent to a viewer that there's message being sent? I think the test is whether a reasonable person would interpret it as some sort of message, not necessarily incurring a specific message. And at least some people would. At least some people understand that this was an artistic, creative design. I thought Rumsfeld's test standard was whether it would be quote, or... Again, Your Honor, I was just quoting from the Holloman case in interpreting the Johnson test. Would it not be overwhelmingly obvious to anybody who saw a Frank Lloyd Wright home in any residential area that it was sending a very powerful message and one that was profoundly different from the architecture that preceded it and the architecture chronologically that followed it? Yes, Your Honor, that was what I was trying to say. And here, where you have houses lined up on Palm Beach that are visible from the beach, where you have traditional house, traditional house, traditional house, and then something else. Wouldn't the message be, I like Frank Lloyd Wright houses? And then the message of every house that is designed, custom designed, that I like this look, I like this style, I like the way that this house makes me feel. So that's the message. Every house sends a message. Your Honor, the way I look at it is the architectural design is art that is protected by the First Amendment. The model depicting the architectural design in 3D format is art that's protected by the First Amendment. And the building that embodies the architect's creative ideas and unique design that is substantially dissimilar, that's the whole point, is a creative and artistic message and therefore warrants First Amendment protection. And whether it's direct scrutiny or not. Ms. Daniel, that's a long sentence. Your time is up. May I ask just one final question, Chief? If I can finish. Sure. I find your comments and arguments helpful. I didn't mean to imply otherwise. And Judge Marcus has one more other questions. Thank you much, Chief. Ms. Daniel, Chief Judge Karnes made reference to the obvious reality that a town or a municipality has a powerful zoning interest in maintaining a certain aesthetic look. This goes beyond the height necessarily or the square footage or the set off, but there's a look that a place may have. If I walk the streets of Paris, there's a particular form of architecture, and I can't build in Paris anything else but a certain 19th and 18th century French look. It can't go higher than six stories. And part of the beauty of the city inheres in the harmonious nature of the Coral Gables imposes all kinds of aesthetic limitations. Can't the town of Palm Beach impose an aesthetic limitation of this kind, even though it is obviously content-based? Your Honor, I think it goes to the question of whether they have objectives, whether they have objective criteria that further the governmental interest no farther than necessary and that is able to be ascertained. And let me just mention one other thing about zoning cases. When the district court cited the aesthetic interest, I started looking at those speech over and over and over again, the ones that I was seeing and not residential. No, but my question to you and Judge Karnes' question to you is precisely focused on a residential community. Cannot that community maintain a certain look? We want French Tudor homes. We want colonial homes. We want mid-century modern homes in the look of Frank Lloyd Wright, whatever. Couldn't they say this is what we want and we're not going to allow you to build a home with a profoundly different architectural look? Your Honor, I think that communities that have homeowner associations can do that. I think when it comes to government... No, no, I'm not asking whether the homeowner's association can do it. I'm talking about state action. Can't the village, the municipality, or the township do that? I think that there are limits on what the government can do when it restricts expressive conduct. So my answer is... You know, I agree with you that there are limits. The questions that we're probing is whether those limits mean that you can, as an aesthetic matter, create a certain kind of look architecturally in a municipality or a town. I think it would infringe on First Amendment rights to actually command expressive expression through architecture in such a rigid way without finding some neutral basis. For example, there are guidelines that are neutral. I think that when you have historic... The Secretary of the Interior has some guidelines that are applied when you go into a historic neighborhood. But when you're not in a context like that and it's your home and if you... Let me ask the question slightly differently. It's my last question. Suppose Burns wanted to build not something that looked like this mid-century modern kind of architecture, but he wanted to put up a great big geodesic dome, although it met the height requirements. It was just a big wall on the land in which he lived. Could the town turn around and say... Could the architects turn around and say, no way. Even though it met the set-off requirements, the height requirements, the square footage requirements, could they say you're not putting up a geodesic dome on that land? Could they say that consistent with the First Amendment and these rules? I think that the First Amendment need for freedom of expression would inhibit the way in which a town could prohibit that type of expression. If there are some objective criteria that can be in I think where it's just a matter of subjective... If they said we want straight lines, we want straight lines, not spheres. I think that's intrusion into property rights, Your Honor. I think it runs counter to the guarantee of the right to express through artistic creation, which is protected by the First Amendment. I understand that this is a tough issue, but the court has stepped up in other circumstances where First Amendment is an important right to protect and gone ahead and ruled for the First Amendment protection, even though it seems shocking to some people because... But you would have to concede that if we would set out on that task here, it would be quite novel and it would arguably upset zoning regs in many, many communities in this circuit and in the country. I will concede it with this one, and I know you want me to... I know my time is up. I will concede that it would be novel, but the one thing I want to add to that, to the court, is that the other side likewise has not cited a single case upholding a restriction like this on a residential, a residence, non-commercial speech on a residence where there was custom-designed architecture intended to and perceived by some as expressing a message in artistic creation. So there's not... They don't have a case either, okay? They don't have a case. Probably, counsel, probably because no one had the audacity to suggest that it's not good advocacy to go with it. I don't suggest. I mean, you've got an oral argument on it, and that's an indication that someone thought it was serious. But just because there's no case saying you can't do A, it doesn't mean that you can do A. It's much... It works much more force in the opposite direction, but we've given you a lot of time because it was helpful. Appreciate that. We will take the case under submission, and that's the last of our cases this week. So we will adjourn.